885 So.2d 641 (2004)
STATE of Louisiana
v.
Dwayne LEWIS and Phillip Bridges.
No. 2004-KA-0227.
Court of Appeal of Louisiana, Fourth Circuit.
September 29, 2004.
*642 Eddie J. Jordan, Jr., District Attorney, Zata W. Ard, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Pamela S. Moran, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant, Dwayne Lewis.
Laura Pavy, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant, Phillip Bridges.
(Court composed of Judge MICHAEL E. KIRBY, Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO JR.).
EDWIN A. LOMBARD, Judge.

PROCEDURAL HISTORY
On October 24, 2001 the State filed a bill of information charging the defendants-appellants Dwayne Lewis and Phillip Bridges with five counts of armed robbery, violations of La. R.S. 14:64[1], and one count *643 of possession of stolen property, a violation of La. R.S. 14:69. Also, in a seventh count of the bill of information, the State charged Bridges alone with violating La. R.S. 14:95.1 relative to being a convicted felon in possession of a firearm. The defendants pled not guilty at their arraignments on October 29, 2001. Pretrial motions were heard on December 14, 2001 and October 18, 2002, and on February 3, 2003 the court issued its ruling denying the motions. Trial was held on August 25, 2003 as to four[2] of the armed robbery charges (counts one, three, four, and six) and the possession of stolen property charge (count two). The jury returned verdicts of guilty as charged on all counts as to each defendant. On September 18, 2003 counsel for Bridges filed a motion for new trial, which counsel for Lewis subsequently adopted. On October 7, 2003 the trial court denied the motion, and after both attorneys announced their clients' readiness for sentencing, the court sentenced each defendant to fifteen years at hard labor without the benefit of probation, parole, or suspension of sentence as to each count of armed robbery. The court sentenced each defendant to two years for possession of stolen property. The court ordered that the sentences run concurrently. Counsel for Lewis immediately moved for and was granted an appeal.
On November 14, 2003, counsel for Bridges filed a motion for an out of time appeal, which the court granted. On December 10, 2003 the State filed a multiple bill charging Bridges with being a second felony offender. Although the matter was set for a hearing several times, the proceedings have not yet been held.
After the appellate record was lodged and briefs from all parties had been filed, the appellant Dwayne Lewis filed a pro se request for the record and to file a supplemental brief. The request was granted, and the record was sent to the defendant on April 8, 2004 with forty-five days in which to file the brief. However, Lewis has not filed a brief.

RELEVANT FACTS
On September 9, 2001, in the hour between 9:00 p.m. and 10:00 p.m., several armed robberies occurred in New Orleans East. Terraine Dennis was the first victim to testify at trial. He recounted that at 9:20 p.m. he and a friend, Isaiah,[3] were walking to Isaiah's house when a green car pulled up in front of them at the intersection of Bill and Benson Streets. Two males, one of whom was armed with a gun, got out and told them to empty their pockets. Mr. Dennis and his friend complied; Mr. Dennis also gave the robbers his bag. The robbers then told the victims to turn around and leave. Mr. Dennis and Isaiah ran in different directions. Mr. Dennis then went home and called the police. When officers interviewed him, he provided them with a description of the perpetrators. He testified at trial that he described one robber as five feet, six inches tall and approximately 150 pounds and the second robber as six feet tall, approximately 175-180 pounds. He also described their clothing. One perpetrator was wearing *644 a white t-shirt, a white bandanna, and dark-colored jeans. The other's jeans and t-shirt were dark-colored.
Not long after the police had arrived at Mr. Dennis's home and interviewed him, the officers transported him to another crime scene. There Mr. Dennis identified some personal items, including his CD player that had been in his bag. He testified at trial that he also identified two suspects on the scene as the robbers; this identification was based on their clothing and because his stolen property was on the scene with the suspects. Mr. Dennis identified the defendants in court as the two suspects who robbed him and whom he identified on the night of the crime. However, during cross-examination, he admitted that at a pretrial motion hearing he had testified he could not identify the men who robbed him. He also clarified that "a lady that drove up the street" had returned some of his belongings to him.
The next victim to testify at trial was Tyereann Henry. She stated that she was walking with her god sister, Jamie Ridgley, on Dwyer Road. on the night of September 9, 2001. They had just left a Ridgley family function and were going to the bus stop to go home because it was a school night. She stated that they saw two males walking toward them. The males walked just past them and then turned around. One of the men, whom Ms. Henry described as the "red" one, pulled out a gun and told Jamie Ridgley, "B', give me all your stuff." Ms. Ridgley gave him her purse, jewelry, and her school bag. Ms. Henry gave him her purse. According to Ms. Henry, the second male, who was dark-skinned, did not specifically ask for anything. Instead he patted Ms. Henry down, but did not take anything. However, as the robbers were walking off, the "red guy" noticed that Ms. Henry was wearing rings, came back, took her jewelry, and then ran off. The girls saw the two robbers leave the area in a bluish-green car.
After the robbery, the girls returned to the home of Ms. Ridgley's grandmother and called the police. Officers arrived and interviewed them. Approximately twenty minutes later, the officers received a dispatch that two suspects were in custody. The officers drove the girls and Ms. Ridgley's grandmother to another location where the girls identified the defendants as the men who had robbed them. At the scene, the police showed Ms. Henry two rings, one of which belonged to her and one which belonged to Jamie Ridgley; Ms. Henry also identified the rings at trial.
During cross-examination, Ms. Henry conceded that, at the time they made the identification of the defendants, she and Jamie Ridgley were aware that the police suspected that the two men had been robbing other people that night. She further admitted that, at the pretrial motion hearing, she had testified that the dark-skinned robber had covered his face with a black hat during the crime.
Jamie Ridgley did not testify at trial, although she had testified at the pretrial motion to suppress identification hearing held on December 14, 2001.
The final victim to testify was Beryl Woods. She stated that, at 9:40 p.m. on September 9, 2001, she was walking to the bus stop to go to work when a car turned the corner and stopped. A man armed with a gun jumped out and demanded her money. She gave him $1.50 from her pocket. He then demanded her rings, which she gave him. When he told her to give up her tote bag, she instead gave him the wallet from inside it. The robber then got back into the car, which Ms. Woods described as a small dark green one, and drove off. Ms. Woods then walked back home and called the police. At first two *645 male police officers arrived, but they then left, telling her that a female officer would arrive shortly to take her statement. Less than thirty minutes after the robbery, the first officers called in and said that two men had been caught. The female officer transported Ms. Woods to the scene where she identified two suspects. She also identified her rings that had been taken in the robbery. Ms. Woods further testified that the second man had been a passenger in the green car and had never gotten out. She identified both defendants in court.
In further testimony, Ms. Woods stated that her wallet was returned to her almost immediately after the robbery by a neighbor who had found it, looked inside, located Ms. Woods' address, and delivered it to her. This occurred before Ms. Woods went to view the captured suspects.
Officer Brian Robertson of the Seventh District testified that he and his partner David Leang were answering calls on September 9, 2001. They responded to a call of an armed robbery of two juveniles at Dwyer Road and Babylon. As he and his partner were interviewing the victims, a radio call came in that the suspects had been apprehended in the Fifth District. The two officers transported the juveniles to Louisa and Elder Street where they made positive identifications of the suspects. Officer Robertson further testified that the victims had provided information that the suspects had fled in a small green car and that one of them had a white bandanna.
Detective Regina Williams testified that she was on patrol in the Fifth District on September 9th. She interviewed a robbery victim (Ms. Woods) at Franklin and North Tonti and then drove the victim to another scene. There, the victim positively identified the suspects.
Officer Matthew McCleary testified that he was on patrol in the Fifth District on September 9, 2001 and heard the dispatcher put out a call of an armed robbery by two black males in a green Nissan Altima. He observed a vehicle matching the description of the wanted vehicle and initiated a traffic stop. At that point the Altima slowed down, and both suspects jumped out. Officers gave chase on foot. Officer McCleary pursued and ultimately apprehended Dwayne Lewis, who had been driving the Altima, while other officers apprehended the second suspect, Phillip Bridges. The officers then returned to the place where the Altima, which was still running when it had been abandoned, had crashed. A check of the license plate revealed the Altima had been reported stolen. Officer McCleary placed Lewis under arrest for possession of stolen property.
At trial, Officer McCleary identified pictures of the Altima, including an interior photograph that reflected that the ignition had been defeated, meaning that the car could be started without a key. He testified that he recovered $252.00 from Lewis, and other officers seized $178.27 from Bridges. Additionally he identified some rings that had been recovered from Lewis. Officer McCleary further identified a gun that was recovered from the area where the defendants were apprehended.
Officer Patrick Hartman testified that he and his partner, Dan Plustache, participated in the response to the call of several armed robberies by two suspects in a green car. Officer Hartman stated that he and his partner apprehended one of the suspects, although he could not recall the suspect's name at trial.
The defense called no witnesses at trial.

ERRORS PATENT
A review of the record for errors patent reveals none.

*646 DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1 (BRIDGES) & 2 (LEWIS)
Both appellants contend that the evidence was insufficient to support their convictions for possession of stolen property, to wit, the green Altima. They argue that, because the owner of the vehicle never testified, the State failed to show that the vehicle was stolen or that the defendants did not have permission to use it. The State responds that the defeated steering column of the vehicle was sufficient evidence to prove the vehicle had been the subject of a theft.
In State v. Thomas, 99-1955 (La.App. 4 Cir. 1/26/00), 752 So.2d 318, this Court citing State v. Ash, 97-2061 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, summarized the standard of review that applies when a defendant claims that the evidence produced to convict him of violating La. R.S. 14:69 was constitutionally insufficient as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proved such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
In order to sustain a conviction under La. R.S. 14:69, the State must prove that (1) the property was stolen; (2) the property was worth more than five hundred dollars; (3) the defendant knew or should have known that the property was stolen; and (4) the defendant intentionally received the property. La. R.S. 14:69; State v. Hoskin, 605 So.2d 650 (La.App. 4 Cir.1992); State v. Lampton, 97-2616 (La.App. 4 Cir. 3/10/99), 729 So.2d 754.
State v. Thomas, pp. 6-7, 752 So.2d at 322-323.
The Louisiana Supreme Court has addressed the particular question of the sufficiency of evidence to show that the property was stolen within the meaning of the *647 statute.[4] In State v. Nguyen, 367 So.2d 342 (La.1979), a storeowner testified regarding a burglary of several jewelry items from his store. The defendant came to the store with one of the items, a pendant, and asked the victim to make a chain for it. The victim took possession of the pendant without informing the defendant that it had been stolen. When the defendant returned to pick it up, the victim told the defendant about the burglary and asked if he would be willing to help recover the other items taken during the burglary. The defendant agreed and accepted $500 from the victim to purchase the stolen items. The defendant was able to purchase a watch for $100 from his landlady, who had apparently obtained it from another tenant, and delivered it to the victim. The defendant also gave the victim back $300, and according to the testimony of the victim's wife, was permitted to keep $100 for his troubles. He was subsequently arrested for possession of the property stolen in the burglary that he had returned to the victim. In considering the argument that this evidence was insufficient to support his conviction, the court stated:
Mere possession of stolen property does not create a presumption that the person in possession of the property received it with the knowledge that it was stolen by someone else; the state must prove that the accused actually knew or had good reason to believe that the property was stolen before a conviction under La.R.S. 14:69 can be obtained. State v. Walker, 350 So.2d 176 (La.1977); State v. Henderson, 296 So.2d 805 (La.1974); State v. Rock, 162 La. 299, 110 So. 482 (1926).
Eminent criminal law treatise writers have observed that the crime of receiving stolen property requires the prosecution to prove additionally, although most statutes do not specifically mention it, that the receiver intended to deprive the owner of his property. W.R. LaFave and A.W. Scott, Criminal Law, s 93 (1972); 2 Wharton's, Criminal Law and Procedure, s 567 (1957); Clark and Marshall, Crimes, s 12.39 (7th ed.1967); cf. R.M. Perkins on Criminal Law, p. 329 (2d ed.1969).
These scholars also maintain that it is essential to the commission of the crime of receiving stolen property that the property in question be "stolen" at the moment the defendant receives it. If at the time of the alleged offense the property, although previously stolen, has lost its stolen character through a recovery by the owner or his agent, the receiver cannot be held guilty. 2 Wharton's Criminal Law and Procedure, s 573 at p. 293 (1957); Clark and Marshall, Crimes, s 12.38 (7th ed.1967); R.M. Perkins on Criminal Law, p. 326 (2d ed.1969).
Nguyen, 367 So.2d at 344. Then court further opined that,
If the law were interpreted so as to prevent the stolen property from losing its stolen character upon recovery by the owner, an absurd result inconsistent with the legislation's purpose would be achieved. Policemen, spouses, relatives, friends and trusted employees acting in good faith for the owner, as well as the owner himself, would be guilty of the crime upon receipt of the property with knowledge that it had once been stolen, if the stolen character of the property *648 were to continue even after recovery by the owner or someone acting for him.
Id. at 345.
In State v. Juengain, 410 So.2d 1099 (La.1982), the court was faced with a case where the evidence regarding the stolen nature of the property was inadmissible hearsay. In that case, the allegedly stolen property was American Express Traveler's checks. The State attempted to introduce business records from American Express to substantiate that they had been stolen, but the trial court disallowed the evidence because the records had not been properly authenticated. However, the trial court did allow the American Express investigator to testify that he had learned that the checks had been stolen; he recounted that he learned this from his investigation that included speaking to the woman who had purchased the checks and reported them stolen. The Supreme Court held this evidence was insufficient as the investigator's knowledge was strictly inadmissible hearsay. Juengain, 410 So.2d at 1101. Because no other evidence was presented to substantiate that the traveler's checks (which the defendant had attempted to sell) were stolen property, the court reversed the defendant's conviction.
A similar issue arose before this Court in State v. Warren, 538 So.2d 1036 (La.App. 4 Cir.1989). In that case the defendant was convicted of the illegal possession of an hydraulic winch, an electric fan, a butane tank, a diesel fuel tank, a counter balance valve, a steel pad eye, two 2 inch couplings, one rotary coupling, and one pressure regulator, all allegedly stolen from a boat yard where he was employed. The owner of the boat yard identified some, but not all, of the items as from his boat yard. However, he was unable to say that they had been stolen from the yard. The only evidence of an actual theft consisted of inadmissible hearsay from a witness who testified that he heard the person from whom the defendant obtained the winch admit that it had been stolen from the boat yard. This Court reversed the conviction because of a lack of admissible evidence that the items were actually stolen.
Similarly, in State v. Dominick, 506 So.2d 193 (La.App. 5 Cir.1987), the court reversed one of the counts for which the defendant was convicted. The defendant was observed stealing goods from a Sears department store in Gretna; the security officers apprehended her and an accomplice with the stolen goods in a car in the parking lot. Also in the car were items traced to a J.C. Penney store in Orleans Parish. At the subsequent trial, the defendant was convicted of theft of the Sears merchandise and possession of stolen property, to wit, the J.C. Penney items. However, the only evidence that the Penney's items were stolen came from the security chief from J.C. Penney, who identified the merchandise as coming from a Penney's but was unable to state that the items had been stolen.
In an earlier case, State v. Bruce, 472 So.2d 79 (La.App. 5 Cir.1985), the Fifth Circuit had also reversed a conviction for possession of stolen property because of a lack of evidence to substantiate a theft. In Bruce the defendant was apprehended in a vehicle that was registered to the Avis airport rental car company and reported stolen to the Kenner police. In an errors patent review for sufficiency of the evidence, the court found that the State had failed to meet the requisite standard under the following facts:
The State's evidence did establish that the defendant was in possession of the vehicle in question, and it also established its value was in excess of $500.
However, the evidence did not establish that the vehicle was the subject of a *649 robbery or a theft nor, under the circumstances, indicate the offender knew or had good reason to believe that the vehicle was the subject of a robbery or theft. Detective Alan Drumm of the Kenner Police Department testified that the car was listed by the Kenner Police as being stolen. He does not say on what the listing as stolen is premised, say just who reported the car stolen, nor lay a foundation as to the reliability of the listing. A Mr. Herbert Washington, employed by Avis Used Cars and relying on business records, testified that the car was owned by Avis on November 11, 1983; that Avis sold the car on January 18, 1984; and that Avis had paid $8421.27 for the car in March, 1983. Although on direct-examination he asserts the car was reported stolen and that the defendant never had permission to have the car, Mr. Washington on cross-exam concedes that he would not know if the defendant had permission to drive the car. Washington, moreover, responds with circular non-reasoning when defense counsel repeats the question. Additionally, he cannot say when last he saw the particular car since Avis had several blue Firebirds at that time. Mr. Washington never rents cars himself but does various odd jobs. Not Washington but the supervisor on duty would report a car stolen. Washington would know about it only by its showing up on the company computer. On redirect, Washington indicates that Avis' business records do not indicate that Bruce ever owned the Firebird. When recalled, Detective Drumm testified that Bruce never produced any rental papers on the car.
The defendant apparently had keys with which to enter and start the car. At least he so deftly got into the locked car that Detective Drumm observing him, gathered he had keys. There is no testimony Bruce tried to elude police officers once they made themselves known and no testimony of the defendant's suspiciously checking about the surroundings as he approached the car. The car was parked to the rear of an apartment complex and backed into its space so that it was not visible from Jefferson Highway. Bruce, apparently, walked directly to the car and got in. When stopped, he never produced any rental or ownership papers. Neither did he ever make any statement. Although Detective Drumm testifies that stolen license plates had been substituted for the car's proper plates, no evidence indicates the defendant knew or should have known of this. Nor is the car's being hidden from street view of itself any good reason to believe it stolen.
Essentially, one element of the crime is supported by uncorroborated hearsay while another is not substantiated at all. Under such circumstances, even viewing the evidence in the light most favorable to the State, no case of the defendant's having committed a crime is proved.
Bruce, 472 So.2d at 81-82.
Arguably, all of the above cases could be distinguished from the instant one because the vehicle in this case had a defeated ignition system and was running despite the lack of a key, thus clearly showing that it had been the subject of a theft. In contrast, the items in the cases discussed above did not have such apparent evidence that they had been stolen. However, the court in Bruce noted that there were two separate elements that were not proven  that the vehicle was stolen and that the defendant possessed it under circumstances wherein he had reason to know it had been. Here, the evidence of the defeated ignition supports a finding that the *650 defendants had reason to know the vehicle had been the subject of a theft, but as the court had noted in Nguyen, an item once stolen does not necessarily retain its "stolen" character forever. Thus, if the vehicle had been stolen, returned to the lawful owner, and then lent by him to the defendants before the ignition system could be fixed, under Nguyen the defendants would not be guilty of possession of stolen property.
The State in its brief cites two cases to support its argument that the defendants' mere presence in a vehicle with a defeated ignition is sufficient to support the conviction. In State v. Sanders, 622 So.2d 817 (La.App. 4 Cir.1993), a tourist drove to the French Quarter and parked his car. Two hours later when he returned, his car was not there, and he assumed it had been towed. After going to the car pound, and finding that it was not there, he called the police and reported it stolen. At 7 o'clock the next morning, the police called him to identify his car in the Uptown area. When he arrived, he saw the defendant wearing his fraternity jacket that had been in the trunk of the car. The steering column of his car had been broken; the lock of the trunk was ripped off; one of the door locks was broken; and the back of the car was dented. The victim testified that he had given no one permission to drive it. The defendant, who had been found in the car by the police when they had responded to a call of a man sleeping in a car with the motor running and blocking the corner, claimed that someone had given him a ride, then parked the car, went upstairs, and never returned. The defendant fell asleep in the vehicle waiting; he claimed he never noticed that the steering column had been broken.
After Sanders was convicted, this Court affirmed, citing State v. Wilson, 544 So.2d 1300 (La.App. 4 Cir.1989), the second case relied upon by the State in its brief. In Wilson, this Court considered whether the fact that the defendant was in a car with a broken steering column and door lock was sufficient to demonstrate that the defendant knew or should have known that the car was stolen and concluded that it was sufficient. Notably, in Wilson, the victim testified to the fact that her vehicle had been stolen and that she had not given anyone permission to drive it. The man who was driving the car when stopped by the police, and who had entered a guilty plea to the offense, testified that Wilson was only a passenger and did not know the car was stolen. This Court concluded that the evidence was sufficient to prove Wilson's constructive possession of a stolen vehicle, noting:
The State clearly proved the vehicle was stolen and was valued in excess of $500.00. Further the evidence is clear that the door lock on the passenger side was "popped out" and that the steering column was broken. There was broken plastic from the steering column on the floor as well as a screwdriver. The defendant was a willing passenger in the vehicle.
State v. Wilson, 544 So.2d at 1302.
The owners of the stolen vehicles testified in both Wilson and Sanders, thus making those cases distinguishable from the instant one. If the owner or some other person with direct evidence of the theft had testified here, this case would be indistinguishable from them. However, because the only evidence of the vehicle's status as stolen property in this case was the hearsay testimony of Officer McCleary, this case appears to be much closer to the Bruce case. This is particularly true in light of the fact that Officer McCleary provided no details regarding the report that the vehicle had been stolen. He did not testify from whom it was allegedly *651 stolen, from where, or when it had been stolen, i.e., whether it had been the day previously, the week previously, or a month previously. Notably, there was no indication that the defendants had actually been involved in the theft of the vehicle, although they clearly had used the vehicle to commit robberies.
The State's evidence did establish that the defendants were in possession of the vehicle in question. However, the evidence did not establish that the vehicle was the subject of a robbery or theft nor, under the circumstances, indicate the offenders knew or had good reason to believe that the vehicle was the subject of a robbery or theft. Even viewing the evidence in the light most favorable to the State, no case of the defendants' having committed a crime is proved. Therefore, we find there was insufficient evidence from which a rational jury could have concluded these defendants were guilty of possession of stolen property.

ASSIGNMENT OF ERROR NUMBER 2 (BY BRIDGES)
In the second assignment of error filed by the appellant Bridges, he argues that the evidence was not sufficient to support his conviction for the armed robbery of Jamie Ridgley, count three of the bill of information, because Ms. Ridgley did not testify. The appellant contends that this conviction rests only on the testimony of Ms. Henry and, without citing any cases to support the contention, avers that the victim must testify for the evidence to be sufficient.
A similar argument was rejected by this Court in State v. Preston, 98-0180 (La.App. 4 Cir. 11/10/99), 752 So.2d 211. In Preston the defendant was convicted, inter alia, of two counts of first-degree robbery. The two victims were together when they were robbed, but only one testified at trial. On appeal the defendant contended that the statute required proof that the victims both had a subjective belief that the defendant was armed, and absent that testimony, the conviction for the first-degree robbery of the absent victim could not stand. This Court rejected that argument, finding that the circumstantial evidence in the form of the other victim's testimony that they both surrendered their valuables was sufficient to prove the crime.
Here, Ms. Henry testified that the defendants approached Jamie Ridgley and herself. One of them, whom she described as the "red" guy, was armed with a weapon and demanded Ms. Ridgley's belongings. Ms. Henry testified that Ms. Ridgley complied with the demand, giving up her book bag and jewelry. The second perpetrator, whom she described as dark-skinned, patted Ms. Henry down while this was occurring. This evidence clearly established Ms. Ridgley was the victim of an armed robbery; furthermore, the evidence established that both defendants were principals to the robberies.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 1 (BY LEWIS)
In the first assignment of error raised by counsel for Dwayne Lewis, the appellant contends that the trial court erred when it denied the motion to suppress the out-of-court identifications that occurred in one-on-one show-up procedures.
Citing State v. Haynes, XXXX-XXXX (La.App. 4 Cir. 4/30/03), 847 So.2d 653, writ denied XXXX-XXXX (La.5/14/04), 872 So.2d 508, this Court in State v. Ford, XXXX-XXXX, pp. 6-7 (La.App. 4 Cir. 2/18/04), 867 So.2d 835, 839, recently reviewed the standard for suppressing a one-on-one out of court identification procedure:

*652 A defendant who seeks to suppress an identification must prove both that the identification itself was suggestive and that a likelihood of misidentification existed as a result of the identification procedure. State v. Prudholm, 446 So.2d 729, 738 (La.1984) State v. Valentine, 570 So.2d 533 (La.App. 4 Cir.1990). One-on-one confrontations between the suspect and the victim, while not favored by law, are generally permissible when the accused is apprehended within a short time after the offense and is returned to the scene of the crime for an on-the-spot identification. State v. Robinson, 404 So.2d 907, 909-910 (La.1981). Such a process assures reliability and fosters prompt release of innocent suspects. Id.

Even if the identification could be considered suggestive, it is the likelihood of misidentification that violates due process, not merely the suggestive identification procedure. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 932. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). Even a suggestive, out-of-court identification will be admissible if it is found reliable under the totality of circumstances. State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517.
The U.S. Supreme Court has set forth a five-factor test to determine whether a suggestive identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite, supra; Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In evaluating the defendant's argument, the reviewing court may consider all pertinent evidence adduced at the trial, as well as at the hearing on the motion to suppress the identification. State v. Higgins, 01-368 (La.App. 5 Cir. 10/17/01), 800 So.2d 918; State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 164. A trial court's determination on the admissibility of identification evidence is entitled to great weight and will not be disturbed on appeal in the absence of an abuse of discretion. State v. Bickham, 404 So.2d 929 (La.1981); State v. Offray, XXXX-XXXX (La.App. 4 Cir. 9/26/01), 797 So.2d 764.
In Ford the victim was accosted by the defendant in the bathroom of a French Quarter restaurant. When one of her friends went to check on her, the defendant fled and was pursued by other friends of the victim. They were able to apprehend the defendant a few blocks away and held him until police arrived. One of the friends then returned to the restaurant to get the victim who went to the scene and identified the defendant. This Court held that it was reasonable and appropriate to attempt to secure an identification immediately.
The Court in Ford cited State v. Carter, 99-2234 (La.App. 4 Cir. 1/24/01), 779 So.2d 125, which involved a fact situation very similar to the instant one. In that case, several people were armed robbed within a short period of time. One of the victims was robbed by the defendant who exited a white van and then fled in it after the robbery. She was able to describe the vehicle to the police. While she was still talking to the officers, she learned that the police were investigating a disturbance that had just occurred nearby. That disturbance was another armed robbery involving suspects who fled in a white van at *653 high speed when a police officer attempted to pull them over. The first victim was transported to the scene of the disturbance where she observed the defendant in handcuffs. She identified him as the person who had robbed her. She also identified her purse and a gun that had been inside the purse when it was stolen; these items had been found at the same location where the defendant and another suspect were apprehended hiding after they had fled from the van. The victims of the other robberies also identified the defendant as the person who had robbed them. This Court concluded that, even if the procedure for identifying the defendant was suggestive, it was reliable and reasonable "[g]iven the fact that he had just emerged from a van involved in a high-speed chase with police officers...." Carter, p. 15, 779 So.2d at 136.
The facts in the instant case are just as strong as those in Carter to justify the show-up identification procedures used. At the December 14, 2001 motion hearing, Officer Claude Nixon, who did not testify at trial, testified that he and Sergeant Eden were some of the Fifth District officers involved in the case. He and the sergeant responded to an armed robbery call at Franklin and Tonti where they were met by members of Ms. Woods' family. The description of a robbery by two males in a small green car was related to the officers. According to Officer Nixon, around the same time, a second armed robbery call came through the Fifth District; this robbery had occurred "just right down the street at Almonaster and North Tonti." The officers immediately proceeded to that scene where they met with a second victim, Mr. Thompson.[5] He informed the officers that he had been robbed by two black males. He was able to give them a more specific description of the vehicle, specifically "a four door green Altima." Mr. Thompson also related that the vehicle was traveling in a lake bound direction on Almonaster, on the overpass towards Higgins. The officers immediately broadcast this information. According to Officer Nixon, twenty minutes later the vehicle was observed at Louisa and Almonaster traveling lake bound on Louisa. Officer Nixon, Sergeant Eden, Officer McCleary, and his partner Officer Del Castio then initiated the traffic stop that resulted in the defendants abandoning the Altima while it was still in motion.
In addition to this testimony, the victims of the robberies, with the exception of Mr. Thompson, testified at the motion hearings held on December 14, 2001 and October 18, 2002. Their testimony was very similar to that given at the trial. They all indicated that the police responded very quickly to their reports of being robbed and that they were transported to the scene for the identifications within a short time. Mr. Dennis candidly admitted that he identified the defendants based upon his property being at the scene; however, he also testified that he was able to identify the suspects' car. Jamie Ridgley testified that she was able to see the face of the dark-skinned robber before he pulled a mask down. She further testified that the second man had a shirt tied around his head, but that she could clearly see his face. Ms. Henry testified at the motion hearing that one robber had a t-shirt tied around his head, but nothing covering his face.
Ms. Woods's testimony at the motion hearing was similar to that from the trial. She gave slightly more detailed testimony *654 regarding the identification procedure itself, however. She said that the police showed her one man first and asked her if it was the man who robbed her; she replied no, because he was the tall one who "never got out of the car." She was then presented with a second suspect, and at that point she identified him as the man who robbed her at gunpoint. In further testimony Ms. Woods said that she remained in the police car and did not know where the suspects came from. She was told that the two suspects had been caught on Higgins and Louisa.
The record of this case, both from the motion hearings and the trial, clearly shows the similarity to the identification procedure held reliable in Carter. A description of the vehicle the robbers were using was broadcast within minutes of the robberies. According to the victims, they were transported to the scene for the identification procedure very shortly after they had been robbed, and all of the robberies occurred within a short time period. When the police attempted to stop the vehicle, the defendants abandoned it without even turning off the motor. Personal property belonging to some of the victims was found on the person of Lewis, and other property was found inside the vehicle. Therefore, even if the procedure used was suggestive, the identifications themselves appear reliable.
This assignment of error lacks merit.
For the foregoing reasons, the appellants' convictions and sentences for armed robbery are affirmed and the appellants' convictions and sentences for possession of stolen things are reversed and vacated.
AFFIRMED IN PART; REVERSED AND VACATED IN PART
NOTES
[1] The docket master and minute entries reflect that Lewis was charged with violating La. R.S. 14:64.3, relative to armed robbery with a firearm. However, the bill of information reflects charges of 14:64 (R. 9). Furthermore, the jury verdicts clearly reflect that both defendants were charged with armed robbery (R. 141-159).
[2] Trial was not held as to count five because the victim could not be located. On January 16, 2004 the State dismissed this count, although the State reserved its right to reinstitute prosecution. The record does not reflect a disposition of the seventh count.
[3] Isaiah's last name is not reflected in transcript; no charges were filed listing him as a victim.
[4] At that time, La. R.S. 14:69 was actually titled "Receiving stolen things" and did not include the specific language referencing possession; instead the crime was defined as "the intentional procuring, receiving or concealing of anything of value which has been the subject of a robbery or theft, ..." In 1982, the statute was amended to substitute "illegal possession of" for "receiving" in the heading and the text.
[5] Mr. Thompson is the victim named in the count of the bill of information that was subsequently dismissed because the prosecution was unable to locate a current address for him.